IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 10, 2016

**JONATHAN D. DREWRY v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Williamson County**
**No. CR048004     Michael Binkley, Judge**

_____

**No. M2015-01934-CCA-R3-PC – Filed September 1, 2016**

_____

The Petitioner, Jonathan D. Drewry, pleaded guilty to aggravated rape, aggravated assault, and aggravated kidnapping and received an effective sentence of twenty-five years in the Department of Correction. The Petitioner filed a post-conviction petition, and the post-conviction court denied relief following a hearing. On appeal, the Petitioner maintains that he received the ineffective assistance of counsel in the trial court. We affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and TIMOTHY L. EASTER, JJ., joined.

Matthew J. Crigger, Brentwood, Tennessee, for the appellant, Jonathan D. Drewry.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Kim Helper, District Attorney General; and Jessica Borne, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

A Williamson County grand jury indicted the Petitioner for aggravated rape, attempted second degree murder, aggravated kidnaping, and aggravated assault. At the guilty plea submission hearing, the State provided a factual basis in support of the Petitioner's guilty plea: On February 13, 2012, the victim was staying at a Quality Inn in Williamson County, Tennessee. The victim left her hotel room to eat dinner at a nearby Shoney's restaurant. While eating dinner, she "came in contact with" the Petitioner. After returning to her hotel room, the front desk notified her that the Petitioner was there

to return some money she had left in the booth at the restaurant. The Petitioner came to the victim's room and gave her the money. The victim invited the Petitioner in for a drink where, at some point in the evening, he made unwanted sexual advances. When the victim declined the sexual advances, the Petitioner assaulted and forcibly raped the victim. After penetrating the victim, the Petitioner began to choke the victim. The victim was able to escape from the hotel room, but the Petitioner caught her and dragged her back to the room before choking her once again to the point of unconsciousness. When she regained consciousness, she successfully escaped from the Petitioner. For these crimes, the Petitioner pleaded guilty to aggravated rape, aggravated assault, and aggravated kidnapping for an effective sentence of twenty-five years.

At the post-conviction hearing, the Petitioner testified that he had completed his high school education and, at the time of his arrest, was employed as a cook and a waiter at Shoney's restaurant. The Petitioner confirmed that these criminal charges were his only charges as an adult.

The Petitioner testified that he was not "entirely" pleased with his trial attorney's ("Counsel") representation. He stated that, after Counsel was retained, the Petitioner underwent a mental evaluation with a psychiatrist, Dr. Montgomery. The Petitioner said that Counsel never reviewed with him the results of Dr. Montgomery's evaluation but did tell the Petitioner that Dr. Montgomery believed he was not competent to stand trial. The Petitioner said that he did not see the psychiatric evaluation report until after he was in prison and that he requested a copy of his discovery from the circuit court. The Petitioner identified his February 1, 2014 letter requesting discovery. The Petitioner explained that he had asked Counsel to see the discovery in his case three or four times but that she had never provided him with discovery, so he sought other avenues for obtaining the discovery materials.

The Petitioner identified a police report with apparent inconsistences that he found in the discovery. One officer said that, at the time of arrest, the Petitioner was lying in bed with a blanket pulled over his head while another officer reported that the Petitioner was sitting in bed watching television with the light on. Next, he identified an emergency room report, once again an item included in discovery, that he did not see until he was in prison. The report indicates the victim disclosed that the sex was consensual until the Defendant attempted anal sex. She told emergency room personnel that she was able to get away from the Defendant and that no anal penetration occurred. The toxicology results showed a blood alcohol of "290," and the victim tested positive for marijuana. There were no obvious tears, lacerations, or bruising to the victim's genitalia. Within the discovery materials, the Petitioner also found the results of the DNA testing, which found no sperm from the Defendant but sperm material from three unknown males.

2

The Petitioner testified that Counsel met with him three or four times at the county jail, with the remainder of the meetings at court appearances. He described their interactions at court as very brief. During the first meeting at the jail, Counsel discussed the financial aspect of her representation. The Petitioner recalled that, at the second meeting at the jail, Counsel told him the charges and said he would undergo a psychiatric evaluation. At the third meeting, Counsel sent someone from her office "to be available" during the psychiatric evaluation.

The Petitioner testified that Counsel had told him that the State would also be conducting a psychiatric evaluation of him with Dr. Moore. Counsel said that the State would "try to use that against me," but he was never told about the results of that evaluation.

The Petitioner testified that, without the discovery materials, he was unable to make a knowing and intelligent decision about pleading guilty. He said that Counsel told him that she would not be taking his case to trial because his father could not afford the cost of trial. He said that she further told him that he would be found guilty at trial with a possible sentence between forty-five and seventy-five years if the trial court ordered consecutive sentences. The Petitioner said that, had he seen the discovery materials, he would have sought a trial.

On cross-examination, the Petitioner testified that Counsel had represented him when he was thirteen years old and had been charged with attacking his mother. The Petitioner agreed that Counsel told him that this juvenile charge could be used to enhance his sentence. The Petitioner acknowledged a statement he made during his psychiatric evaluation with Dr. Montgomery that Counsel was "good" and "helping" him with the case. He explained that at the time he made the statement, he was "off" his medication and relying solely on what his father was telling him.

The Petitioner testified that he underwent a second psychiatric evaluation with Dr. Moore a month later at the State's request. He agreed that the report indicated that he had once again expressed that he was happy with Counsel's representation. When asked what had changed his mind, the Petitioner responded that he did not "know everything" at the time of his guilty plea because Counsel had failed to advise him of important aspects of discovery. In the same report, the Petitioner references that there is a "lack of semen" making the State's case stronger for physical abuse rather than sexual abuse. The Petitioner explained that he knew about the semen based upon statements made to him by Dr. Montgomery.

The Petitioner agreed that the State's offer of a twenty-five-year sentence was "a lot" better than the potential forty to seventy-five-year range if convicted. He agreed that

3

he considered this when deciding to plead guilty but that he also considered Counsel's statement that she would withdraw. He said that he had believed that if Counsel withdrew, "it would all be stacked on top of each other and [he] was going to be railroaded." He agreed that Counsel told him that the trial court would appoint another attorney but that she also said the new attorney would not have enough time to prepare for trial.

The Petitioner testified that on the several occasions he asked Counsel for the discovery, she told him that "it wasn't a good idea for me to see it or have it because it was sensitive material, she didn't want people going through it." He confirmed that she did not discuss the content of the discovery with him either.

The Petitioner testified that, when Counsel presented the State's offer of twenty-five years, she told him that if he did not accept the State's offer she would have to withdraw because his father could not afford trial costs. Counsel also told the Petitioner that he would "lose" at trial. The Petitioner maintained that Counsel did not discuss any of the State's evidence with him. The Petitioner recalled the guilty plea submission hearing and agreed that the trial court reviewed his rights with him and advised him that the trial court would appoint an attorney if the Petitioner chose to proceed to trial. He affirmed that he told the trial court that he agreed that he was guilty based upon the facts recited by the State. The Petitioner agreed that the trial court took a break for lunch, allowing the Petitioner two hours to further discuss the plea agreement with Counsel, and after the break he pleaded guilty. He explained that he was scared and believed that twenty-five years was better than forty to seventy-five years. He stated that he did not now believe he would have received a forty-year sentence based upon the discovery.

On redirect examination, the Petitioner testified that his statements to both psychiatrists during his evaluations were made early in the course of Counsel's representation of him.

Counsel testified that she was retained to represent the Petitioner in February 2012. Initially, she raised the insanity defense and diminished capacity. Counsel identified the psychiatric evaluation and could not recall whether she provided the Petitioner with a copy but stated that she reviewed the results with the Petitioner. Counsel acknowledged that the report indicated that the Petitioner "was not able to appreciate the wrongfulness of his alleged actions." She agreed that while the psychiatric examiner, Dr. Montgomery, considered the Petitioner's intoxication, he also considered that the Petitioner was not taking his medications and had "complicated underlying psychiatric disorders."

4

Counsel testified that she also reviewed Dr. Moore's report with the Petitioner. The report, contrary to Dr. Montgomery's evaluation, indicated that the Petitioner did not have a mental illness or condition at the time of the alleged offense that would have caused him to lack the capacity to form the requisite mental state of intent. Counsel said that she discussed Dr. Moore's report with Dr. Montgomery and that "[Dr. Montgomery's] opinion was diluted."

Counsel testified that she could not recall whether she provided the Petitioner with copies of the discovery, but she reviewed all the evidence with him. She identified the police report and agreed that in one officer's summary the victim says only that the Petitioner made "sexual comments." The report makes no reference to sex or penetration. Counsel identified the emergency room records. She agreed that the records stated that the victim reported the sex was consensual and that no penetration actually occurred. Counsel identified the DNA report and agreed that the report indicated that testing of both a vaginal and an anal swab failed to reveal the presence of semen.

Counsel testified that she did not bring any documentation to verify whether or not she had sent any of the discovery to the Petitioner. Counsel agreed that she provided post-conviction counsel with a disc on June 19, 2014, of her files with regard to the Petitioner. Counsel agreed that there was no written communication to the Petitioner in her files and one email to the State.

Counsel testified that she was aware that the Petitioner was arrested in his hotel room without a search warrant. When asked why she did not raise this in a suppression motion, she stated that the Petitioner "made some statements to [police] fairly quickly." Counsel disagreed that a successful suppression would have made a "big difference" in the case, explaining that the plea was entered before "we got to that place where we would even be doing suppression."

On cross-examination, Counsel agreed that, although the victim told medical personnel that the vaginal intercourse was consensual, the victim also indicated that the Petitioner choked her. Counsel stated that in addition to the written reports, there were audio recordings of statements from both the victim and the Petitioner. Counsel confirmed that there was "voluminous evidence" in this case, and she reviewed the evidence with the Petitioner. Counsel said that she also ran a criminal history on the victim to check for impeachable offenses.

Counsel testified that she filed the motion for mental evaluation quickly based upon her representation of the Petitioner when he was a juvenile. Counsel said that she had two interviews with the Petitioner at the jail, and she met with him at the seven or

5

eight court dates. About her conversation with Dr. Montgomery following her receipt of Dr. Moore's psychiatric evaluation of the Petitioner, Counsel said:

> Well, I considered [Dr. Montgomery's] opinion diluted and unable to withstand the [competency] hearing when he stated to me that basically in so many words said, that I didn't say that during the whole time he wasn't aware of what he was doing.

Counsel again affirmed that she had reviewed the psychiatric evaluations with the Petitioner and talked with the Petitioner about speaking with Dr. Montgomery in light of Dr. Moore's report. She stated that she discussed "other documents" with the Petitioner as well. Counsel said that the Petitioner did not want to go to trial. Counsel agreed that she informed the Petitioner that she would be unable to represent him at trial but denied telling him that a new attorney would not have enough time to prepare for trial.

After both parties had finished their examinations, Counsel offered, "Since this is about me, I do want to say that there is information that I had given the Juvenile representation that became part of this process that is not documented anywhere here. . . . So, I can give more detail if it's appropriate." The trial court asked the Petitioner if it was okay for Counsel to testify about the juvenile proceedings, and the Petitioner said he did not have an issue with Counsel "bringing that up." Counsel clarified that she would be testifying about conversations with the Petitioner during her representation of him. The trial court asked the Petitioner if he would waive the attorney client privilege in order to allow Counsel to testify about their communication during Counsel's representation in the juvenile proceedings. The Petitioner said yes.

Counsel testified that the Petitioner's juvenile offense was a "serious sexual offense" during which the Petitioner's mother "felt that she was going to be raped" and subsequently suffered severe PTSD. The Petitioner was placed in Hermitage Hall, a facility for sex offenders, and later placed in a group home. While living in the group home, the Petitioner alleged he had "been involved in a murder." After much discussion, "nothing else become of that [because they] were not able to determine whether or not that was real." Counsel stated that she could not "tell if [the Petitioner was] being truthful or not" and, therefore, he could not testify. She said she also warned the Petitioner that his mother would likely be called to testify against him during the sentencing hearing. She stated that this information was "important . . . because that all went in to the processing of coming up with [a] plea agreement that ultimately was acceptable to him."

Following the hearing, the post-conviction court issued a written order denying relief. The post-conviction court concluded that the Petitioner had failed to establish by

clear and convincing proof that he was entitled to post-conviction relief. It is from this judgment that the Petitioner appeals.

## II. Analysis

On appeal, the Petitioner maintains that the post-conviction court erred in denying relief because Counsel was ineffective. The Petitioner contends that Counsel rendered deficient performance by telling the Petitioner, one year into her representation, that she would withdraw if he did not accept the plea offer and decided to proceed to trial. He further contends that Counsel's performance was deficient because she failed to provide him with discovery. The Petitioner asserts that, without the discovery materials, he was unable to form a knowing and intelligent decision about pleading guilty. The State responds that there is no evidence that Counsel rendered deficient performance or that the Petitioner suffered prejudice from any alleged deficiency. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the

deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by

8

demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994). In the context of a guilty plea, as in this case, the effective assistance of counsel is relevant only to the extent that it affects the voluntariness of the plea. Therefore, to satisfy the second prong of *Strickland*, the petitioner must show that there "is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985) (footnote omitted); *see also Walton v. State*, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997).

In a written order issued after the hearing, by its findings, the post-conviction court accredited Counsel's testimony that she reviewed all of the discovery materials with the Petitioner and that the Petitioner did not want to proceed to trial. The post-conviction court found that the Petitioner had failed to prove by clear and convincing evidence the allegations set forth in his petition and that the Petitioner had failed to prove any prejudice from Counsel's alleged deficient performance.

The evidence does not preponderate against the post-conviction court's findings. Counsel testified that she met with the Petitioner two times at the jail and seven or eight times at court. She stated that she had reviewed all discovery with the Petitioner as well as the results of both psychiatric evaluations and the possible impact of those evaluations. At the post-conviction hearing, the Petitioner acknowledged that during the evaluations, he exhibited a knowledge and understanding of some of the specific evidence alleged against him, while also maintaining that Counsel had not reviewed the evidence with him. Counsel testified that the Petitioner did not want a trial on the charges and, therefore, she worked toward a settlement.

Accordingly, the Petitioner has failed to prove by clear and convincing evidence that Counsel's performance was deficient and that "but for" the alleged deficiency the Petitioner would have proceeded to trial. The Petitioner is not entitled to relief.

## III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE

9